# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * | * |
| SINIDU ROBI and | * |
| YILAK KEBEBEW, legal | *   No. 12-352V |
| representatives of a minor child, | *   Special Master Christian J. Moran |
| DAGIM YILAK, | * |
| | *   UNPUBLISHED |
| Petitioners, | * |
| | *   Filed: April 4, 2014 |
| v. | * |
| | *   Contemporaneous records; testimony |
| SECRETARY OF HEALTH | *   contradicting records; seizure |
| AND HUMAN SERVICES, | *   disorder; onset. |
| | * |
| Respondent. | * |
| * * * * * * * * * * * * * * * * * * * * | * |

Simina Vourlis, Law Offices of Simina Vourlis, Columbus, Ohio, for petitioners.
Jennifer L. Reynaud, United States Dep't of Justice, Washington, DC, for respondent.

## RULING FINDING FACTS[1]

Sinidu Robi and Yilak Kebebew filed a petition for compensation under the National Childhood Vaccine Injury Compensation Program (the "Vaccine Act" or "Program"), 42 U.S.C. § 300aa-10 et seq. (2006), alleging that their son, Dagim, suffered a Table encephalopathy as a result of the vaccines he received on June 18, 2009. Petition at ¶¶ 3-4, 6-9. Alternatively, petitioners allege that Dagim suffered other vaccine-caused injuries, including seizures, infantile spasms with intractable epilepsy, hypertonia, and developmental delays. Id. at 5.

---

[1] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this ruling on its website. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

To support their claim for compensation, Ms. Robi and Mr. Kebebew filed medical records and affidavits. The recitation of events in the affidavits does not match entirely with the events set forth in the medical records. Specifically, the affidavits assert that Dagim experienced some health problems that are not documented in a medical record created when Dagim was supposedly having his first seizures. When special masters are confronted with discrepancies between medical records and affidavits, special masters are encouraged to hold hearings to evaluate the testimony of the affiants. See Campbell v. Sec'y of Health & Human Servs., 69 Fed. Cl. 775, 779-80 (2006).

A hearing was held on June 20, 2013, during which Dagim's mother and father, Ms. Robi and Mr. Kebebew, testified. Dagim's brother, Kalikeyas Hailemariam, and his aunt, Frehiwot Kebebew, also testified. All four witnesses appeared in person. Ms. Robi, Mr. Kebebew, and Frehiwot Kebebew testified with the assistance of an interpreter.

Following the hearing, petitioners filed their proposed findings of fact. Petitioners' Proposed Findings of Fact ("Pet'rs' Proposed Findings"). Thereafter, respondent filed her response to petitioners' proposed findings of fact. Respondent's Response to Pet'rs' Proposed Findings of Fact ("Resp't's Resp."). With these submissions, findings of facts are ready to be made.

## Standard for Finding Facts

Petitioners are required to establish their cases by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for finding facts in the Vaccine Program begins with analyzing the medical records, which are required to be filed with the petition. 42 U.S.C. § 300aa–11(c)(2). Medical records that are created contemporaneously with the events they describe are presumed to be accurate. Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Not only are medical records presumed to be accurate, they are also presumed to be complete, in the sense that the medical records present all the

problems of the patient. Completeness is presumed due to a series of propositions. First, when people are ill, they see a medical professional. Second, when ill people see a doctor, they report all of their problems to the doctor. Third, having heard about the symptoms, the doctor records what he or she was told.

Appellate authorities have accepted the reasoning supporting a presumption that medical records created contemporaneously with the events being described are accurate and complete. A notable example is Cucuras in which petitioners asserted that their daughter, Nicole, began having seizures within one day of receiving a vaccination, although medical records created around that time suggested that the seizures began at least one week after the vaccination. Cucuras, 993 F.3d at 1527. A judge reviewing the special master's decision stated that "[i]n light of [the parents'] concern for Nicole's treatment . . . it strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred." Cucuras v. Sec'y of Health & Human Servs., 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F.2d 1525 (Fed. Cir. 1993).

Decisions by judges of the Court of Federal Claims have followed Cucuras in affirming findings by special masters that the lack of contemporaneously created medical records can contradict a testimonial assertion that symptoms appeared on a certain date. See, e.g., Doe/70 v. Sec'y of Health & Human Servs., 95 Fed. Cl. 598, 608 (Fed. Cl. 2010) (stating, "[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), aff'd sub nom. Rickett v. Sec'y of Health & Human Servs., 468 Fed. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion); Doe/17 v. Sec'y of Health & Human Servs., 84 Fed. Cl. 691, 711 (2008); Ryman v. Sec'y of Health & Human Servs., 65 Fed. Cl. 35, 41-42 (2005); Snyder v. Sec'y of Health & Human Servs., 36 Fed. Cl. 461, 465 (1996) (stating, "[t]he special master apparently reasoned that, if Frank suffered such [developmental] losses immediately following the vaccination, it was more likely than not that this traumatic event, or his parents' mention of it, would have been noted by at least one of the medical record professionals who evaluated Frank during his life to date. Finding Frank's medical history silent on his loss of developmental milestones, the special master questioned petitioner's memory of the events, not her sincerity."), aff'd, 117 F.3d 545, 547-48 (Fed. Cir. 1997).

3

The presumption that contemporaneously created medical records are accurate and complete is rebuttable, however.  For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a first symptom appeared, despite the lack of a notation in a contemporaneous medical record.  42 U.S.C. § 300aa-13(b)(2).  By extension, special masters may engage in similar fact-finding for cases alleging an off-Table injury.  In such cases, special masters are expected to consider whether medical records are accurate and complete.  To overcome the presumption that written records are accurate, testimony is required to be "consistent, clear, cogent, and compelling."  Blutstein v. Sec'y of Health & Human Servs., No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998).

In determining the accuracy and completeness of medical records, special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony.  The Court of Federal Claims listed four such explanations.  The Court noted that inconsistencies can be explained by: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist.  La Londe v. Sec'y Health & Human Servs., 110 Fed. Cl. 184, 203 (Fed. Cl. 2013), aff'd 2014 WL 1258137 (Fed. Cir. Mar. 28, 2014).

In weighing divergent pieces of evidence, special masters usually find contemporaneously written medical records to be more significant than oral testimony.  Cucuras, 993 F.2d at 1528.  Testimony offered after the events in question is less reliable than contemporaneous reports when the motivation for accurate explication of symptoms is more immediate.  Reusser v. Sec'y of Health & Human Servs., 28 Fed. Cl. 516, 523 (1993).  However, compelling oral testimony may be more persuasive than written records.  Campbell, 69 Fed. Cl. at 779 ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Camery v. Sec'y of Health & Human Servs., 42 Fed. Cl. 381, 391 (1998) (this rule "should not be applied inflexibly, because medical records may be incomplete or inaccurate"); Murphy v. Sec'y of Health & Human Servs., 23 Cl. Ct. 726, 733 (1991), aff'd, 968 F.2d 1226 (Fed. Cir. 1992) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance.") (citation omitted).

4

The relative strength or weakness of the testimony of a fact witness affects whether this testimony is more probative than medical records. An assessment of a fact witness's credibility may involve consideration of the person's demeanor while testifying. Andreu v. Sec'y of Health & Human Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009); Bradley v. Sec'y of Health & Human Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

## Summary of Parties' Positions

The parties dispute when Dagim's seizures began. Ms. Robi and Mr. Kebebew argue that Dagim's seizures began on the evening of June 18, 2009, less than 24 hours after Dagim received his two-month vaccinations. Pet'rs' Proposed Findings at 2-3. The Secretary disagrees, however, noting that petitioners' proposed factual finding concerning onset is not supported by Dagim's contemporaneous medical records.

Ms. Robi and Mr. Kebebew offer their own testimony and the testimony of their close relatives to describe the changes in Dagim's health soon after the vaccinations he received during his two-month well-child visit on June 18, 2009.[2] The details regarding petitioners' testimonial assertions are found in the section immediately below. The subsequent section lists the Secretary's challenges to petitioners' assertions. The Secretary focuses on the records created between Dagim's two-month vaccinations and his visit to a neurologist on December 9, 2009, a period of almost six months. She emphasizes the absence of reports

---

[2] The following provides a brief biographical sketch of each witness:

Sinidu Robi is the wife of Yilak Kebebew and mother to their three children. Transcript ("Tr.") at 10; Pet'rs' exhibit 14 at ¶ 1 (Ms. Robi's first affidavit).

Yilak Kebebew is the husband of Sinidu Robi and father to their three children. Tr. 10; Pet'rs' exhibit 15 at ¶ 1 (Mr. Kebebew's first affidavit).

Kalikeyas Hailemariam is the brother of Dagim Yilak. At the time he offered his testimony, Kalikeyas was 14 years old. He was 10 years old when Dagim was born. Tr. 67-68; Pet'rs' exhibit 22 at ¶¶ 1-2.

Frehiwot Kebebew is the sister of Yilak Kebebew. She has lived with her brother and his wife since she has been in the United States, which includes the time period when Ms. Robi was pregnant with Dagim and continuously to the date of the hearing. Tr. 96-97; Pet'rs' exhibit 19 at ¶¶ 1-2 (Ms. Kebebew's affidavit).

5

documenting the seizure-like activity petitioners contend began soon after Dagim's vaccinations. Additionally, she cites histories provided by petitioners in the months after Dagim's vaccinations that contradict their current position as to when Dagim's seizures began.

Petitioners' Factual Assertions

Ms. Robi and Mr. Kebebew assert that Dagim was a healthy child at the time of his two-month vaccinations on June 18, 2009. Pet'rs' Proposed Findings at 2.[3] During the evening of June 18, 2009, Dagim allegedly developed a fever and began crying inconsolably. Pet'rs' Proposed Findings at 2. Ms. Robi testified that she called Dagim's pediatrician that evening and reported his fever and continuous crying. Pet'rs' Proposed Findings at 2-3.

Ms. Robi and her husband allege that:

> From the evening of June 18, 2009 and each and every day thereafter, Dagim exhibited seizure symptoms of jerking and flipping (rolling) his eyes up (back). Dagim's head would fall forward. He continued to cry nonstop. He would wake from sleep jerking and flipping (rolling) his eyes (up). He ceased to make eye contact and to recognize his family. Dagim became a different person.

Pet'rs' Proposed Findings at 3. Ms. Robi and Mr. Kebebew add that, within a week of Dagim's vaccinations, Ms. Robi called the pediatrician's office to report these behaviors, which they allege Dagim continued to exhibit for the next seven weeks. Pet'rs' Proposed Findings at 3-4.

Ms. Robi testified that she informed Dagim's pediatrician of his seizure symptoms at Dagim's four-month well-child visit on August 14, 2009. Pet'rs' Proposed Findings at 4. Ms. Robi and Mr. Kebebew suspect, however, that Dagim's pediatrician may have misunderstood what Ms. Robi was attempting to communicate. Pet'rs' Proposed Findings at 4.

---

[3] All citations concerning petitioners' factual assertions are made to Petitioners' Proposed Findings of Fact. In their Proposed Findings of Fact, petitioners cite extensively to the transcript, referencing specific page and line numbers.

The Secretary's Challenges

In her response to petitioners' Proposed Findings of Fact, the Secretary notes that the parties agree that Dagim was healthy and developing normally when he received his two-month vaccinations on June 18, 2009. Resp't's Resp. at 2. Additionally, the Secretary acknowledge that, on October 1, 2009, Dr. Michael Perry expressed his concern that Dagim's behavior, captured on video on September 27, 2009, was consistent with infantile spasms. Resp't's Resp. at 2.

The Secretary, however, challenges petitioners' assertions concerning the onset of Dagim's abnormal behavior. Specifically, she points to the lack of contemporaneous medical records supporting petitioners' assertions that Ms. Robi called Dagim's pediatrician's office on the evening of June 18, 2009, and two more times within a week of his two-month vaccinations. Resp't's Resp. at 2-3. The Secretary also notes contemporaneous medical records that conflict with the reports of Dagim's abnormal behaviors, including his head dropping and nonstop crying, that Ms. Robi allegedly made to Dr. Haase on August 14, 2009. Resp't's Resp. at 3-4.

The Secretary references several medical records which indicate that Dagim's condition began later than Ms. Robi and Mr. Kebebew allege. For example, during Dagim's hospitalization at Nationwide Children's Hospital in early October 2009, Ms. Robi reported that Dagim's abnormal behavior had been happening for about 2 months. Resp't's Resp. at 5 (citing exhibit 7.12 at 43).[4]

---

[4] Respondent cited several notations in Dagim's medical records placing the onset of his condition around October 10, 2009. Resp't's Resp. at 5-6 (citing exhibit 7.12 at 44 ("Dagim is [an] almost 6 month old male with a 2 month history of jerks."); exhibit 7.12 at 59 ("Almost 6 month old male with 2 months of progressive jerking activity and regression of milestones."); exhibit 7.12 at 85 ("His parents report 'jerking' movements for the last two months. . . . The parents point out that he was sleeping well until about 2 months of age and then started waking up and having inconsolable crying.").

7

# **Finding of Fact**[5]

Based on the record as a whole, Dagim's excessive eye blinking first occurred on or about August 10, 2009.

For his four-month well baby appointment, Ms. Robi took Dagim to see Dr. Haase at Children's Close to Home on August 14, 2009. Exhibit 7.12 at 16-19; exhibit 23; Tr. 46. Dr. Haase's report presents Dagin as a normally developing infant and suggests no abnormal behaviors. Id. Although Dr. Haase did not record any problems with Dagim, it is possible that Ms. Robi's limited English impeded her ability to communicate information about Dagim accurately.

Four days later, on August 17, 2009, Ms. Robi took Dagim to Dr. Perry of Building Blocks Pediatrics. Exhibit 5.2 at 31. The short interval between these appointments suggests that Dr. Haase did not address a concern that Ms. Robi raised or attempted to raise on August 14. For Ms. Robi to be frustrated enough to switch pediatric practice groups, Dagim's problem must have existed before his August 14, 2009 visit to Dr. Haase.

The question of how long before August 14, 2009, Dagim's problem began can be answered, in part, by the record from Dr. Perry's August 17, 2009 evaluation. Dr. Perry recorded that Dagim had watery eyes for seven days. Exhibit 5.2 at 31, 53. Ms. Robi easily could have confused repeated blinking with watery eyes. Furthermore, medical records from early October 2009, indicate that

---

[5] In evaluating the record as a whole, including Dagim's medical records and the affidavits and hearing testimony of Ms. Robi, Mr. Kebebew, and their witnesses, the undersigned considered several factors.

First, the undersigned considered that Ms. Robi, Mr. Kebebew, and Frehiwot Kebebew were born in Ethiopia. Exhibit 1 at 1; Tr. 42, 95-96. The range of conditions that would prompt a person to call or to visit a doctor may be different in Ethiopia than in the United States. Additionally, the undersigned recognizes that, as non-native speakers, Ms. Robi and Mr. Kebebew's reports to Dagim's health care providers may not have been fully understood and thus not accurately recorded.

Second, the undersigned acknowledges that the record from Dagim's August 14, 2009 visit to Dr. Haase may not be entirely accurate. Dr. Haase has a busy practice and relies on parents of infants to describe their child's problems. Dr. Haase may not have comprehended everything that Ms. Robi was attempting to communicate.

Finally, in light of Ms. Robi and Mr. Kebebew's heartfelt testimony, the undersigned is certain that they are loving and caring parents who will go to great lengths to care for their children.

8

Dagim's problems began two months earlier, in August 2009. Exhibit 7.12 at 43-44, 59, 85. If these records—created close in time to the events in question—are correct, then they support a finding that the onset of Dagim's condition was in early August 2009, on or about August 10.

Crediting Ms. Robi's testimony that the onset of Dagim's condition was approximately seven weeks earlier than August 10, 2009, is difficult. In Ms. Robi's account, Dagim was never the same after his June 18, 2009 vaccinations. See exhibit 14 at ¶ 9; exhibit 19 at ¶ 3. Because Ms. Robi and Mr. Kebebew are loving parents, it is unlikely that they would fail to seek medical attention for their child when he changed dramatically. Ms. Robi's scheduling of an appointment with Dr. Perry following Dagim's visit to Dr. Haase just days earlier demonstrates that she and her husband were willing to take swift action to address their concerns about Dagim's condition.[6]

## Conclusion

The parties are ordered to provide this ruling to any expert they retain. If the expert's opinion is not consistent with these findings of fact, the opinion is likely to not be persuasive. See Burns v. Sec'y of Health & Human Servs., 3 F.3d 415, 417 (1993) (holding that the special master did not abuse his discretion in refraining from conducting a hearing when the petitioner's expert "based his opinion on facts not substantiated by the record").

A status conference is set, sua sponte, for **Wednesday, April 24, 2013 at 1:00 P.M. Eastern Time**. The petitioners should be prepared to propose the next step in this case.

**IT IS SO ORDERED.**

S/Christian J. Moran
Christian J. Moran
Special Master

---

[6] Their delay in following through with Dr. Perry's recommendation that Dagim undergo an EEG is might be explained by language barriers.